HOYER & HICKS
Richard A. Hoyer (SBN 151931)
*rhoyer@hoyerlaw.com*
Ryan L. Hicks (SBN 260284)
*rhicks@hoyerlaw.com*
Nicole B. Gage (SBN 318005)
*ngage@hoyerlaw.com*
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
*tel* (415) 766-3539
*fax* (415) 276-1738

Attorneys for Plaintiff
STEPHEN ANDERSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| STEPHEN ANDERSON,<br><br>Plaintiff,<br><br>vs.<br><br>SALESFORCE.COM, INC,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DAMAGES:**<br>1. **Whistleblower Retaliation in Violation of Sarbanes-Oxley**<br>2. **Retaliation in Violation of California Labor Code §1102.5**<br>3. **Race Discrimination in Violation of FEHA**<br>4. **Disability Discrimination in Violation of FEHA**<br>5. **Failure to Accommodate in Violation of FEHA**<br>6. **Failure to Engage in the Interactive Process**<br>7. **Retaliation in Violation of FEHA**<br>8. **Interference in Violation of FMLA**<br>9. **Retaliation in Violation of FMLA**<br>10. **Interference in Violation of CFRA**<br>11. **Retaliation in Violation of CFRA**<br><br>**DEMAND FOR JURY TRIAL** |
|---|---|

Plaintiff STEPHEN ANDERSON ("Plaintiff" or "Mr. Anderson") brings this action against Defendant SALESFORCE.COM, INC ("Salesforce" or "Defendant") and alleges as follows:

///

///

COMPLAINT FOR DAMAGES                                                                                       1

# INTRODUCTION

1. Mr. Anderson began working at Salesforce in about June 2014. While at Salesforce, Mr. Anderson became concerned with several of the company's accounting practices. Mr. Anderson complained several times that these accounting practices misrepresented the company's profitability and violated federal securities law. In July 2016, Mr. Anderson notified senior management and the company purportedly conducted an investigation. However, two months after Mr. Anderson's complaint, the company suspended him for allegedly indirectly threatening his manager in a conversation with his manager's supervisor about his manager's whistleblower retaliation. Mr. Anderson never threatened anyone, yet the company placed him on leave for nearly a year while it "investigated." In July 2017, the company claimed that it eliminated Mr. Anderson's position through automation, although his coworkers did not see any evidence of the company automating his duties. Human resources stated that Mr. Anderson could apply internally, except to any role that interacted with Marketing – meaning that he could not apply to the jobs for which was most trained and qualified, and for which Salesforce had hired him. This not only punished Mr. Anderson while rewarding the main perpetrators of the accounting violations, but also relied on pernicious stereotypes about Black men by implying that Mr. Anderson was a violent danger to the entire Marketing team. Mr. Anderson diligently applied to almost 20 positions, yet did not receive a single interview. On September 25, 2017, the company terminated him.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff was, at all relevant times herein, a resident of the State of California and employed by Defendant Salesforce to work at offices in San Francisco, California.

3. Defendant Salesforce sells enterprise software and services in California and throughout the United States. At all relevant times, Salesforce was Plaintiff's employer.

4. The Sarbanes-Oxley Act and Family and Medical Leave Act ("FMLA") authorize private rights of action to recover damages. 18 U.S.C. §1514A and 29 U.S.C. §2617. This Court therefore has original federal question jurisdiction under 28 U.S.C. §1331. This Court has supplemental jurisdiction over the California state law claims under 28 U.S.C. §1367(a)

1  because they are so related to this action that they form part of the same case or controversy.

2  5.  Venue in this district is proper pursuant to 28 U.S.C. §1391(b). At all material times, Plaintiff was an employee of Defendant in the geographic area encompassing the Northern District of the State of California where the violations took place.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.  Plaintiff filed a timely charge of discrimination against Defendant with the California Department of Fair Employment and Housing ("DFEH"). Plaintiff received a right-to-sue notice from DFEH dated September 12, 2018, and has commenced this action in a timely manner.

7.  On March 14, 2018, Mr. Anderson notified the Department of Labor and thus timely complied with the whistleblower requirements of the Sarbanes-Oxley Act. The Secretary of Labor has not issued a final decision within 180 days of Plaintiff's complaint to the Secretary of Labor. 18 U.S.C. §1514A(b). Plaintiff therefore elects to bring suit in United States district court.

## FACTUAL ALLEGATIONS

8.  Mr. Anderson is an experienced finance and marketing professional. He has a business degree from UC Berkeley and a master's degree from the University of San Francisco. He has nearly two decades' industry experience working in finance and marketing for large technology companies such as Apple, Cisco, Hewlett-Packard, and NetApp.

9.  Mr. Anderson is African-American.

10. In June 2014, Salesforce hired Mr. Anderson as a contractor. On March 23, 2015, having assessed the quality of his work, Salesforce hired Mr. Anderson as a full-time Marketing Operations Manager. His compensation included a salary, plus healthcare benefits. He reported to Director of Marketing Operations, Cliff Hawkins. Mr. Anderson's job duties included planning, executing, and reporting the Non-Corporate Marketing budgets.

11. Mr. Anderson enjoyed working at a fast moving and rapidly growing technology company, and he excelled at Salesforce. He was also well liked and respected by his peers. For example, six different coworkers wrote the following: (1) "Steve Anderson is one of my

favorite folks at Salesforce. Kind, courteous, responsive, thoughtful, dedicated, knowledgeable... the list goes on 'n' on. If he has any weaknesses, I have not yet experienced it;" (2) "Over my career I have worked with a lot of people in finance organizations and Steve is a standout;" (3) "I quickly became one of his biggest fans, something that remains true to this day. Some key reasons why: He was a fantastic business partner. Proactive and trusted, yes, and also patient, supportive, responsive, thoughtful;" (4) "Great attitude, polite, firm, follows the policy.  He is great at what he does. Keeper." (5) "Being in a position of enforcing deadlines is difficult. Steve is great at communicating the limits and maintaining them, which makes us learn the systems;" and (6) "He is extremely responsive and very patient in walking me through many of the Marketing Ops processes." In April 2016, the company awarded Mr. Anderson a merit increase and a bonus.

12.     However, Mr. Anderson's acknowledged dedication did not mean he was willing to condone dishonesty in the company's accounting. In fact, Mr. Anderson expressed repeated concerns about the company's accounting of expenses. Specifically, Mr. Anderson complained about the company's practice of creating accruals for products or services that Salesforce never received, and the related practice of leaving open large purchase orders long after it became clear that they would cost far less than originally anticipated. By leaving the purchase orders open as an expense on the company's books, Salesforce misrepresented how close to its budget target it would finish each quarter. If the company budgeted more than it spent, and thus its spending ran under its target, the company could leave the purchase orders open as an expense on the books, making it falsely appear that the company spent more money than it did. It could later recognize the expense at the true, smaller amount in another more favorable quarter. If the company ran over budget, which Mr. Hawkins and others called "running hot," it could close the purchase order and immediately recognize an expense credit to bring down the overall expenses closer to the company target. Because Salesforce wanted to appear to investors to hit within 1 percent of its earnings budget projections, it was helpful to have such "adjustments" in the expense accounts. As a result, the company appeared to be more well-managed than it was.

COMPLAINT FOR DAMAGES 4

13. Mr. Anderson complained about these deceitful practices repeatedly to Mr. Hawkins and Mr. Hawkins' supervisor, Senior Director, Marketing Business Planning, Ajit Deshpande. However, Mr. Hawkins and Mr. Deshpande resisted Mr. Anderson's attempts to fix the accounting issues. Mr. Deshpande complained that closing the existing purchase orders around the same time would be too disruptive and would leave too big an impact on the company's books.

14. On July 21, Mr. Anderson met with Mr. Hawkins to discuss Mr. Anderson's 360 performance feedback, which was uniformly positive. At the meeting, however, Mr. Hawkins did not provide any co-worker feedback and instead accused Mr. Anderson of having his own "agenda." He claimed that Mr. Anderson was trying to steer the direction of the Marketing Operations group and that he was not a team player. Mr. Anderson was surprised by this unexpected criticism. Mr. Anderson stated that he was merely trying to make the accounting repeatable and auditable and that it was in Salesforce's best interests to do so. But, Mr. Hawkins shouted over and over that Mr. Anderson was trying to advance his agenda. Each time, Mr. Anderson asked Mr. Hawkins not to speak to him like that, to stop yelling, and told him that his conduct was hurtful. When Mr. Hawkins would not stop, Mr. Anderson eventually left the meeting emotionally shaken.

15. On July 25, Mr. Anderson emailed Mr. Hawkins and Mr. Deshpande a rebuttal to Mr. Hawkins' criticisms. Mr. Anderson again complained about the misleading open purchase orders. Mr. Anderson specifically referred to the accounting problems as "cooking the books" and a possible Sarbanes-Oxley violation. When Mr. Anderson did not receive a response, he forwarded the email to his recruiter. Only then did it eventually reach the Associate General Counsel, Global Ethics & Integrity and the VP, Internal Audit.

16. On July 28, Mr. Anderson met with the Associate General Counsel and VP, Internal Audit to discuss his concerns about the company's suspicious accounting practices. Mr. Anderson detailed his concerns that booking accruals for products and services that the company did not receive during the accounting period was deceptive and produced unreliable

COMPLAINT FOR DAMAGES                                                                                                   5

financial information. They agreed that Mr. Anderson's concerns were serious and thanked him for bringing them to her attention.

17. On July 29, Mr. Anderson took a medical leave of absence to care for his mental health disability that was jeopardized by Mr. Hawkins' retaliation and unfair accusations.

18. On August 23, while still out on medical leave, Mr. Anderson went to lunch with members of the Corporate Marketing Team. During the lunch, he discussed various issues pertaining to his personal life, including his wife's diagnosis with cancer. Mr. Anderson was overcome with emotion and began crying during the lunch. Members of the team reported his behavior to Mr. Deshpande as they claimed to be uncomfortable.

19. After several weeks on leave, on September 21, Mr. Anderson went to his office to make sure his login credentials and files were in order, so that he could seamlessly return to work. Throughout the course of that day, Mr. Anderson had several casual conversations with S.V.P. Marketing Operations, Thimaya Subaiya, during Mr. Subaiya's smoke breaks. During those conversations, Mr. Anderson and Mr. Subaiya discussed a wide range of casual topics, such as their kids, sports, and working for Salesforce. During one of these conversations, Mr. Anderson expressed his frustration with Mr. Hawkins' unfair treatment of him, saying that if Mr. Hawkins had treated him that way in the neighborhood where Mr. Anderson had grown up, things could have turned physical. Shortly thereafter, the company claimed that Mr. Anderson had threatened Mr. Hawkins (who had not been present) in his conversation with Mr. Subaiya. It did not interview Mr. Anderson about what he had said. Salesforce also referred to Mr. Anderson's communications during the time he was in treatment and on leave of absence – such as his emotional concerns about his wife and the company's accounting manipulation – to stereotype Mr. Anderson's mental health as dangerous.

20. Salesforce did not return Mr. Anderson from his medical leave of absence or engage in the interactive process to try and accommodate his mental health disability. Instead, it suspended Mr. Anderson on an administrative leave, claiming he was unstable, and punishing him for the very mental health problems that the company's retaliatory and

discriminatory conduct had exacerbated. During that time, Mr. Anderson continued to participate in the company's purported investigation into his accounting manipulation complaint.

21. On September 23 and 27, Mr. Anderson complained to the Associate General Counsel and VP, Internal Audit that Mr. Hawkins' treatment of him was due to his race. Mr. Anderson complained that Mr. Hawkins did not allow Mr. Anderson access to important stakeholders or strategic projects that he gave to Mr. Anderson's White and Asian coworkers. Mr. Hawkins also frequently badgered Mr. Anderson – asking him the same question repeatedly and raising his voice – which he did not do with Mr. Anderson's coworkers. However, no one followed up with Mr. Anderson regarding his race discrimination complaint.

22. The company did not report the results of its investigation for seven months. On February 21, 2017, the company informed Mr. Anderson that it had concluded its investigation into the accounting manipulation. It informed Mr. Anderson that Salesforce had examined its accounting practices and that it had them reviewed by an outside law firm. While the company agreed that Mr. Anderson raised serious concerns, it claimed that they did not warrant anyone losing their job or going to prison because no individual adjustment was more than a million dollars. In response, Mr. Anderson again volunteered to help correct the problem.

23. During this time, the company still did not allow Mr. Anderson to return to work despite his repeated requests. On April 3, the company informed Mr. Anderson that it was "assessing its corporate structure" and would get back to him.

24. On July 7, Director Employee Relations, Kim Booker, emailed Mr. Anderson stating that the company had eliminated his position, but that he could apply internally at Salesforce. Ms. Booker claimed that the company had automated his position, although Mr. Anderson's co-worker told him that she did not see any evidence of automating his job duties. On July 11 – almost a year after Anderson's comment, and with no explanation for the delay – Ms. Booker issued Mr. Anderson a final written warning for his comment to Mr. Subaiya. Ms. Booker again stated that Mr. Anderson was free to apply internally, but now claimed that he

was strictly prohibited from applying to any jobs that reported to Mr. Hawkins, to Mr. Deshpande, or that interacted with anyone in the Marketing department. She further stated that he was prohibited from going on floors eleven through fourteen of Salesforce West. If Mr. Anderson did not find a position by September 14, 2017, the company would terminate his employment.

25.   Mr. Anderson dutifully applied for almost 20 jobs. However, he did not receive an interview for a single position. Further, on August 14, Ms. Booker emailed Mr. Anderson claiming that Mr. Hawkins did not violate any Salesforce policies and then scolded Mr. Anderson for applying to two jobs that purportedly interacted with Marketing. She insisted that he route his job search entirely through Human Resources, contrary to normal company practice. On September 14, just before Mr. Anderson's final workday at Salesforce he contacted a hiring manager with whom he had previously worked. When Ms. Booker found out, she again reminded Mr. Anderson not to go directly to the hiring manager and to apply through Human Resources. On September 25, 2017, Salesforce terminated Mr. Anderson.

26.   The above allegations are incorporated by reference in each and every cause of action stated below.

**FIRST CAUSE OF ACTION**
**Whistleblower Retaliation in Violation of Sarbanes-Oxley**

27.   Plaintiff was an employee of Defendant.

28.   Plaintiff provided information, caused information to be provided, or otherwise assisted in an investigation regarding conduct which Plaintiff reasonably believed constituted a violation of section 1341, 1343, 4344, or 1348, and the rules and regulations of the Securities and Exchange Commission relating to fraud against shareholders to a person with supervisory authority over Plaintiff and/or a person working for Defendant who had the authority to investigate, discovery, or terminate misconduct.

29.   Defendant suspended, terminated, harassed, and/or discriminated against Plaintiff because of his complaints.

30.   Plaintiff was harmed.

31.   Defendant's conduct was a substantial factor in causing Plaintiff's harm.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of California Labor Code §1102.5

32. Plaintiff was an employee of Defendant.

33. Plaintiff disclosed information that he had reasonable cause to believe disclosed a violation of, or noncompliance with, federal and state, statutes and regulations to a person with authority over him and/or an employee who has the authority to investigate, discover, or correct the violation or noncompliance.

34. Defendant terminated Plaintiff.

35. Plaintiff's disclosure of information that he had reasonable cause to believe disclosed a violation of, or noncompliance with, federal, and state statutes and regulations to a person with authority over him and/or an employee who has the authority to investigate, discover, or correct the violation or noncompliance was a contributing factor for the termination and/or other adverse actions.

36. Plaintiff was harmed.

37. Defendant's conduct was a substantial factor in causing Plaintiff's harm.

## THIRD CAUSE OF ACTION
### Race Discrimination in Violation of FEHA

38. Defendant is an employer within the meaning of FEHA.

39. Plaintiff was an employee of Defendant.

40. Defendant terminated Plaintiff.

41. Plaintiff's race was a substantial motivating reason for the termination and/or failure to promote.

42. Plaintiff was harmed.

43. Defendant's conduct was a substantial factor in causing Plaintiff's harm.

## FOURTH CAUSE OF ACTION
### Disability Discrimination in Violation of FEHA

44. Defendant is an employer within the meaning of FEHA.

45. Plaintiff was an employee of Defendant.

46. Plaintiff has a mental disability that limits him in a major life activity, including working.

47. Defendant knew of Plaintiff's disability and/or regarded Plaintiff as disabled.

48. Plaintiff was able to perform the essential functions of his job with reasonable accommodations for his condition.

49. Defendant terminated Plaintiff.

50. Plaintiff's disability and/or need for reasonable accommodations and/or Defendant's belief that Plaintiff was disabled was a substantial motivating reason for the termination and/or failure to promote.

51. Plaintiff was harmed.

52. Defendant's conduct was a substantial factor in causing Plaintiff's harm.

### FIFTH CAUSE OF ACTION
### Failure to Provide Reasonable Accommodation in Violation of FEHA

53. Defendant is an employer within the meaning of FEHA.

54. Plaintiff was an employee of Defendant.

55. Defendant knew that Plaintiff has a mental disability that limits him in a major life activity, including working.

56. Plaintiff was able to perform the essential functions of his job with reasonable accommodations for his disability.

57. Defendant failed to provide reasonable accommodations for Plaintiff's disability.

58. Plaintiff was harmed.

59. Defendant's failure to provide reasonable accommodations was a substantial factor in causing Plaintiff's harm.

### SIXTH CAUSE OF ACTION
### Failure to Engage in the Interactive Process in Violation of FEHA

60. Defendant is an employer within the meaning of FEHA.

61. Plaintiff was an employee of Defendant.

62. Plaintiff has a mental disability that was known to Defendant.

63. Plaintiff requested that Defendant make reasonable accommodations of his disability, so that he would be able to perform the essential functions of her job.

64. Plaintiff was willing to participate in an interactive process to determine whether reasonable accommodations could be made.

65. Defendant failed to participate in a timely good faith interactive process.

66. Plaintiff was harmed.

67. Defendant's failure to engage in a good faith interactive process was a substantial factor in causing Plaintiff's harm.

### SEVENTH CAUSE OF ACTION
### Retaliation in Violation of FEHA

68. Defendant is an employer within the meaning of FEHA.

69. Plaintiff was an employee of Defendant.

70. Plaintiff opposed discriminatory activity that he reasonably believed to be unlawful under FEHA and sought reasonable accommodations for his disability.

71. Defendant terminated Plaintiff.

72. Plaintiff's opposition to activity he reasonably believed to be discriminatory and/or Plaintiff's request for reasonable accommodations for his disability was the motivating reason for Defendant's decision to terminate Plaintiff.

73. Plaintiff was harmed.

### EIGHTH CAUSE OF ACTION
### Interference in Violation of FMLA

74. Defendant is an employer covered by FMLA.

75. Plaintiff suffers from a serious health condition that made him unable to perform the functions of his job.

76. Plaintiff was eligible for medical leave under the FMLA.

77. Plaintiff notified Defendant of his serious health condition and his need for medical leave.

78. Defendant interfered with Plaintiff's FMLA rights.

79. Plaintiff was harmed.

80. Defendant's conduct was a substantial factor in causing Plaintiff's harm.

### NINTH CAUSE OF ACTION
### Retaliation in Violation of FMLA

81. Plaintiff was eligible for medical leave under the FMLA.

82. Plaintiff requested and took a medical leave.

83. Defendant discriminated against and terminated Plaintiff.

84. Plaintiff's request to take a medical leave and his taking of the medical leave was a negative factor in Defendant's decision to terminate and/or discriminate against Plaintiff.

85. Plaintiff was harmed.

86. Defendant's retaliatory conduct was a substantial factor in causing Plaintiff's harm.

### TENTH CAUSE OF ACTION
### Interference in Violation of CFRA

87. Defendant is an employer covered by CFRA.

88. Plaintiff suffers from a serious health condition that made him unable to perform the functions of his job.

89. Plaintiff was eligible for medical leave under CFRA.

90. Plaintiff notified Defendant of his serious health condition and his need for medical leave.

91. Defendant interfered with Plaintiff's CFRA rights.

92. Plaintiff was harmed.

93. Defendant's conduct was a substantial factor in causing Plaintiff's harm.

### ELEVENTH CAUSE OF ACTION
### Retaliation in Violation of CFRA

94. Defendant is an employer covered by CFRA.

95. Plaintiff was eligible for medical leave under CFRA.

96. Plaintiff requested and took a medical leave.

97. Defendant discriminated against and terminated Plaintiff.

98. Plaintiff's request to take a medical leave and his taking of the medical leave motivated Defendant's decision to terminate and/or discriminate against Plaintiff.

99. Plaintiff was harmed.

100. Defendant's retaliatory conduct was a substantial factor in causing Plaintiff's harm.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks relief as follows:

1. Economic damages for lost wages, employment benefits, and other compensation as a result of Defendant's wrongful conduct, plus interest;

2. Noneconomic damages for pain and suffering and emotional distress;

3. Statutory attorney's fees;
4. Injunctive relief;
5. Declaratory relief;
6. Liquidated damages;
7. Civil penalties;
8. Exemplary damages;
9. Costs of suit; and
10. Such other relief as the court deems just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which he has a right to a jury trial.

Date: November 5, 2018

HOYER & HICKS

*/s/ Nicole Gage*

Nicole B. Gage
Richard A. Hoyer
Attorneys for Plaintiff
STEPHEN ANDERSON